IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 17–cv–03016–KMT

BETHANY ANDERSON,

      Plaintiff,

v.

AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY,

      Defendant.

---

## ORDER TO SHOW CAUSE

---

      Under Federal Rule of Procedure 11(b), for every pleading, motion, or other paper presented to the court, an attorney must certify, to the best of his knowledge, information, and belief, formed after a reasonable inquiry, (1) that he isn't presenting the filing for any improper purpose, (2) that the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for changing the law, (3) that the factual contentions are warranted on the evidence or will likely have support after further investigation, and (4) that the denials of factual contentions have similar support. Fed. R. Civ. P. 11(b); *King v. Fleming*, 899 F.3d 1140, 1148 (10th Cir. 2018). Rule 11 establishes a standard of objective reasonableness. *Adamson v. Bowen*, 855 F.2d 668, 673 (10th Cir. 1988); *Estate of Strong v. City of Northglenn, Colorado*, No. 1:17-CV-1276-WJM-SKC, 2018 WL 6589813, at *2 (D. Colo. Dec. 14, 2018).

      In brief, after unsuccessfully demanding payment of the policy limits from her insurance carrier under underinsured motorist benefits subsequent to a January 5, 2016 automobile accident

in which she was not at fault, Plaintiff brings claims against her insurance company for (1) breach of contract; (2) statutory unreasonable delay and denial of benefits under Colo. Rev. Stat. § 10-3-1115; and (3) common law bad faith breach of insurance contract.  (Compl. [Doc. No. 4] at ¶¶ 53 – 69.)  This Order to Show Cause addresses the Second and Third claims for relief. Currently pending before this court, *inter alia*, is Defendant's "Motion for Summary Judgment by Defendant" ("Mot.") [Doc. No. 103] filed March 1, 2019.[1]

To establish a claim for statutory unreasonable delay or denial of her insurance benefits, the plaintiff must prove that the insurer delayed or denied payment of a covered benefit "without a reasonable basis."  Colo. Rev. Stat. § 10-3-1115(1)(a)  To establish a claim for common law bad faith breach of insurance contract, Plaintiff "must establish that the insurer acted unreasonably and with knowledge of or reckless disregard for the fact that no reasonable basis existed for denying the claim."  *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 847 (Colo. 2018). The statutory bad faith claim is a distinct cause of action from a common law bad faith claim. The statutory language in § 10-3-1115 imposes a standard of liability on insurers different from that imposed by the common law as expressed in § 10-3-1113, in that § 1115 expressly deletes the requirement that an insurer "knew that its delay or denial was unreasonable or . . . the insurer recklessly disregarded the fact that its delay or denial was unreasonable."  *Kisselman v. Am. Family Mut. Ins. Co.*, 292 P.3d 964, 973 (Colo. App. 2011) (citing Erin Robson Kristofco, *CRS §§ 10–3–1115 and –1116: Providing Remedies to First–Party Claimants,* 39 Colo. Law. 69, 70– 71 (July 2010)).  The court in *Kisselman* stated, "[W]e conclude the General Assembly intended

---

[1] The matter is fully briefed: "Plaintiff's Response to Motion for Summary Judgment by Defendant" ("Resp.") [Doc. No. 107] was filed on March 22, 2019, and Defendant's "Reply in Support of Motion or Summary Judgment" [Doc. No. 110] was filed on April 5, 2019.

the Statutes to impose a new statutory duty on insurers not to 'unreasonably delay or deny payment of a claim for benefits owed,' which duty would be breached if the insurer had no 'reasonable basis' to delay or deny the claim for benefits." *Id*. at 974. In common between the two theories is that to avoid liability the insurer must take actions grounded on a reasonable basis; in other words, if there indeed <u>was</u> a reasonable basis for an insurer's actions, there can be no liability under either a statutory or common law claim. The catch, of course, is determining if a proffered basis was "reasonable."

Upon review of the Complaint and the summary judgment briefing, the court cannot ascertain <u>any evidence</u> set forth by the Plaintiff or Defendant that supports a conclusion that Defendant did not have a reasonable basis for refusing to pay $250,000.00 to Plaintiff as damages caused by the automobile accident.

Plaintiff notified her insurance company, American National Property and Casualty Company ("ANPAC"), of the accident and the underinsured motorist claim on or about January 6, 2016, the day after that accident (Compl. at ¶ 21), and on January 15, 2016, ANPAC notified Plaintiff that it had opened a UIM claim and had begun its investigation into the loss. (*Id*. at ¶¶ 22-23.)

The parties do not dispute that under the underinsured motorist section of the insurance policy contract, an "underinsured motor vehicle" is defined by the policy as "a land motor vehicle, the ownership, maintenance, or use of which is insured or bonded for bodily injury or death at the time of the accident, but the bodily injury liability limits **are less than the total damages for bodily injury** or death that the insured person is legally entitled to collect." (Mot., Ex. Y, [Doc. No. 103-25], Insurance Policy, at 11)(emphasis added).) Under the policy

provisions, the insurance carrier, ANPAC, agrees to "pay damages **for bodily injury** which an insured person is legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle." (*Id*. at 10 (emphasis added).) The insurance policy defines bodily injury as "bodily injury to a human being, and sickness, disease, or death that results from it." (*Id*. at 2.)

After that time Plaintiff continued to seek and receive treatment and provide medical records and bills to ANPAC. (*Id*. at ¶¶ 23-25, 26, 27, 34-35, 39.) ANPAC paid for Plaintiff's therapies and treatments as she submitted bills, up to the full amount ($10,000) of her medical payment coverage. (*Id*. at ¶ 37; UF[2] No. 35.)

The tortfeasor responsible for causing the action maintained an automobile liability insurance policy with Geico Insurance Company with bodily injury policy limits of $100,000.00. (Compl. at ¶ 16.) Sometime between November 22, 2016 and December 14, 2016, Geico agreed to settle Plaintiff's bodily injury claim for the bodily injury limits of $100,000.00. (*Id*. at ¶ 17. 26.) Additionally, in this same time period, Plaintiff began demanding that ANPAC pay the $250,000.00 UIM policy limits of Plaintiff's underinsured motorist coverage, even though she only had incurred approximately $48,000.00 of medical bills. (Mot., Exs. J and O; UF No. 41.) At that point ANPAC began re-evaluating the claim and requesting additional medical records.

---

[2] Pursuant to D.C.COLO.LCivR 56.1 "[a] motion under Fed. R. Civ. P. 56 for summary judgment or partial summary judgment shall include a statement of undisputed facts, argument, and legal authority incorporated into the motion in lieu of a separate opening brief." Defendant set forth 64 undisputed material facts in its original brief. (Mot. at 2-11.) Plaintiff did not challenge any of the 64 facts as being in dispute. Fed. R. Civ. P. 56(e)(2) provides, "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion . . . ." Therefore, the court accepts the 64 facts set forth in Defendant's motion as undisputed for purposes of this order.

(UF Nos. 42, 44-45.)  ANPAC's Claim Committee reviewed the claim on December 29, 2016.  (UF No. 46.)  Richard Elet, from ANPAC, testified that the claim was presented to the Committee "more due to the TBI and the inner ear concussion" that was asserted by Plaintiff.  (Resp., Ex. C at 13:43-18.)[3]  Although Defendant disputed the calculations of Plaintiff's counsel, ANPAC offered $30,000.00 in settlement of the UIM claim and sent a check in that amount on January 31, 2017.  (UF Nos. 48-49.)  At that time the total incurred medical expenses were approximately $55,000.00.  (Compl. at ¶ 36.)

On approximately May 18, 2017, Plaintiff refused the settlement offer and again demanded payment of full policy limits.  (UF No. 50.)  On May 30, 2017, Defendant requested an independent medical examination of Plaintiff, advising that it "continues to dispute the cause and extent of your client's claimed injuries and damages as a result of the accident, and in particular, the reasonableness, necessity and relatedness of regenerative medicine treatment."  (Id.; Mot., Ex. R.)

On July 26, 2017, plaintiff presented for an independent medical examination with Dr. Tashof Bernton, M.D., at Colorado Rehabilitation and Occupational Medicine in Aurora, Colorado.  (UF No. 50.)  Dr. Bernton is a licensed medical doctor, board certified in Internal Medicine and Occupational Medicine.  (Mot., Ex. U, at 13.)  Dr. Bernton's comprehensive

---

[3] It is unclear to the court from the portion of the transcript provided by Plaintiff, whether Mr. Elet was referring to this 2016 Claims Committee review or to a later review of the same Committee occurring subsequent to the preparation of the Dr. Bernton IME in September 2017. At a later point in the testimony, Mr. Elet states in connection with the Bernton IME "[a]nd then when she got the [Bernton IME] report in, we took it back to committee for review" (id. at 13:45:41) and "in this case since it had already been to committee, we would take it back in for review for the results of the IME and how the company wanted to proceed with the handling of the claim from that point on." (Id. at 13:47:06-13:47:29.)

thirteen-page, single spaced, report was provided to Plaintiff on or about September 12, 2017. (Compl. at ¶ 41.) Among other things Dr. Bernton stated, "In summary , the patient had persistent muscular strain as well as anxiety and some posttraumatic stress as a result of the motor vehicle accident. Specific systematic desensitization protocols have not been utilized, and the patient has been inappropriately diagnosed as having cognitive impairment due to the head injury." (Mot., Ex. U at 12.) After review of Dr. Bernton's medical findings (See UFs 54-58), by letter dated September 12, 2017, ANPAC continued to dispute the reasonableness, necessity, and relatedness of the regenerative medicine treatment Plaintiff had received and also noted that Dr. Bernton found "some of the medical treatment that Ms. Anderson has already received does not appear clinically reasonable or medically necessary." (*Id.*) Ms. Zaffuto, the ANPAC adjuster, also corrected the total amount of medical bills Plaintiff claimed to have presented of $58,971.42, but which actually totaled $54,397.03 -- just slightly more than half of the amount she had received from the tortfeasor. (UF No. 59; Mot., Ex. V.)

As part of the September 12, 2017 letter, ANPAC continued to offer to settle the UIM claim for $40,000 and, as noted previously, it appears the Claims Committee again reviewed the Plaintiff's claim, and Plaintiff continued to demand payment of $250,000.00. (UF No. 60).

At this point, approximately eighteen months after the accident, bodily injury medical expenses still did not rise to the level of tortfeasor payment, even including compensation for treatments the independent medical examiner found to be contra-indicated. As of November 29, 2017, the Defendant had before it medical billings with a total cost of approximately $75,000.00, payment to Plaintiff by the tortfeasor of $100,000.00, payment to Plaintiff by ANPAC of $10,000.00 in medical payments, payment to Plaintiff by ANPAC of $30,000.00 in UIM

benefits, a 13 page independent medical examination report from a board certified, licensed medical physician concluding that legitimate medical expenses would not exceed the $100,000.00 tortfeasor payment, and an offer, nevertheless, to pay an additional $10,000.00 in UIM benefits. At that point, Plaintiff had not informed Defendant she disputed the findings from Dr. Bernton nor had she relayed concerns about Dr. Bernton's medical qualifications.

In its Response to the summary judgment motion, Plaintiff presents a letter from her counsel to ANPAC <u>dated November 30, 2017</u>, with one or more attached reports from Plaintiff's treating physician, Dr. Allan. Plaintiff admits this is the **<u>first</u>** notification to ANPAC that Plaintiff questioned or disagreed with Dr. Bernton's independent medical evaluation. (Resp. at 7, lines 2-3 and Ex. B.) The Complaint was filed on the same day the letter was sent. Plaintiff's bad faith allegations in the November 30, 2017 Complaint state

> 42. The independent medical examiner's report contained numerous factual errors, inconsistencies and omissions about Plaintiff's medical records and treatment.
> 43. ANPAC's correspondence to Plaintiff that was included with the independent medical examiner's report takes an unreasonable and inaccurate position that Plaintiff's medical care was either unrelated to the collision or that it was unnecessary.

These conclusory statements are the sole allegations of bad faith conduct. Expanding only slightly from these conclusions, Plaintiff in her Response alleges that Defendant's IME report contains "numerous errors, omissions and supported findings contrary to established medical diagnoses and that Defendant ignored the shortcomings in spite of correspondence from Plaintiff's lawyer pointing it out" (Resp. at ¶ 10), that Defendant "lacked the ability to assess whether the IME physician was qualified to express the opinions in the report" (*id*. at ¶ 11), and

that Defendant did not adequately explain to Ms. Anderson "how it had evaluated her claim."[4] (*Id*. at ¶ 13.)

While the attorneys representing the Plaintiff may have had confidence that Dr. Allan's rebuttal evidence and conclusions concerning Dr. Bernton's IME "should" alter the view of the insurance company in adjusting the claim and paying benefits to the Plaintiff, that was an action that would have occurred (or not occurred) in the future. On November 30, 2017, the date Plaintiff filed her Complaint, it appears to the court that the attorneys had no factual or evidentiary basis whatsoever to claim that the company, up to that point in time, had no reasonable basis for its actions. The company had been given no opportunity to even question or alter its decision-making basis and no opportunity to investigate and evaluate the attack on the IME report. Therefore, it appears that the Plaintiff and her attorneys had no factual or evidentiary basis whatsoever to file claims that Defendant was lacking a reasonable basis for its actions in refusal to pay $250,000.00 in damages or that the Defendant was acting unreasonably and with knowledge of or reckless disregard for the fact that no reasonable basis existed for denying the claim for policy limits payment. If correct, filing the Complaint was a violation of Rule 11(b).

When, after notice and an opportunity to respond, a court determines that an attorney has violated Rule 11(b), it may impose sanctions under Rule 11(c). *See Cooter & Gel v. Hartmarx Corp.*, 496 U.S. 384, 407 (1990) (explaining that district courts have "broad discretion to impose Rule 11 sanctions"). The court must consider the purposes to be served by the imposition of sanctions and so limit its sanctions "to what suffices to deter repetition of the conduct or

---

[4] This allegation is truly baffling given the undisputed receipt by Plaintiff of the 13-page report from Dr. Bernton and the September 12th letter from the adjuster at ANPAC.

comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4); *King*, 899 F.3d at 1148.

Wherefore, it is **ORDERED**

Plaintiff shall show cause in writing **<u>on or before October 24, 2019</u>** why Plaintiff and her attorneys should not be sanctioned for violating Fed. R. Civ. P. 11(b), including as a sanction granting Defendant of Summary Judgment on Claims Two and Three of the Complaint.

Dated October 3, 2019.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge