IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 17–cv–03016–KMT

BETHANY ANDERSON,

     Plaintiff,

v.

AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY,

     Defendant.

---

# ORDER

---

This matter is before the court on Defendant's "Motion for Summary Judgment."

(["Motion"], Doc. No. 103.)  Plaintiff has responded in opposition to Defendant's motion, and

Defendant has replied.  (["Response"], Doc. No. 107; ["Reply"], Doc. No. 110.)  At the court's

request, the parties have also filed supplemental briefs.[1]  (["Supplemental Response"], Doc. No.

127; ["Supplemental Reply"], Doc. No. 131.)

The case arises out of a January 5, 2016 automobile accident at the intersection of

Lincoln Avenue and Jordan Road, in Parker, Colorado, in which Plaintiff was struck on the

---

[1] Deficiencies in Plaintiff's response to this Motion led this court to issue an Order to Show Cause, as to why the case should not be partially dismissed for violation of Federal Rule of Civil Procedure 11.  (Doc. No. 126.)  Plaintiff thereafter filed a response to the Order to Show Cause with various attachments, including her expert witness report regarding industry standards.  (*See* Doc. No. 127, Ex. 1-8.)  Given that Plaintiff's response to the Order to Show Cause introduced new evidence and argument, the court allowed Defendant to supplement its Reply to the instant Motion.  (Doc. No. 131.)

passenger side of her car by a nonparty driver who had run a red light.[2]  (Mot. 2 ¶ 1; Mot. Ex. A ["Traffic Report"], Doc. No. 103-1 at 1-4; *see* ["Complaint"], Doc. No. 4 at 2 ¶¶ 6-8.)  The collision caused Plaintiff's vehicle to roll over and come to rest on its roof.[3]  (Traffic Report 4.) Plaintiff, who had no fault in the accident, was reportedly unable to exit her vehicle using the driver's door, and instead, had to crawl through the vehicle to exit through a broken window in the rear.  (Mot. 2 ¶ 7; Traffic Report 4; Resp. 1.)

The traffic report for the incident details no injuries for any of the drivers involved in the collision.  (Mot. 2-3 ¶¶ 8-9; *see* Traffic Report 1-8.)  Plaintiff walked away from the scene of the accident that day without seeking or obtaining any immediate medical treatment, refusing transport to the hospital or to any other medical facility.  (Mot. 3 ¶¶ 10-12, Ex. C at 48:2-16.) Over the next few months, however, Plaintiff was reportedly diagnosed with "interspinous ligament injuries, facet injuries, injuries to her right hip, a concussion and post-concussion syndrome, post-traumatic stress, depression, spinal joint hypertrophy, disc protrusions and an

---

[2] The Local Rules of Practice of the United States District Court for the District of Colorado – Civil provides that "[a] motion under Fed. R. Civ. P. 56 for summary judgment <u>shall</u> include a statement of undisputed facts, argument, and legal authority incorporated into the motion in lieu of a separate opening brief."  D.C.COLO.LCivR 56.1 (emphasis added.)  Here, in support of its Motion, Defendant sets forth sixty-four "undisputed material facts," which correspond to thirty-two attached exhibits.  (Mot. 2-11 ¶¶ 1-64; *see* Mot. Ex. A-AF.)  Plaintiff, in her Response, does not challenge any of those sixty-four facts as being in dispute, nor does she challenge the authenticity of any of the attached exhibits.  (*See* Resp. 1-13.)  Therefore, for purposes of evaluating the instant Motion, the court accepts the sixty-four facts as undisputed.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

[3] A third vehicle subsequently struck the nonparty driver's vehicle, but made no contact with Plaintiff's vehicle.  (Traffic Report 4.)

annular tear, cervical sprain/strains, and ligamentous instability or failure, among other injuries." (Compl. 3 ¶ 15.) Plaintiff thereafter began a series of chiropractic and massage treatments, as well as regenerative injections and psychological care, and she now alleges that her medical expenses arising from the January 5, 2016 accident are in excess of the $100,000.00 settlement she received from the nonparty driver's insurance provider, and the $250,000.00 limit applicable to her own automobile insurance coverage. (Compl. 2 ¶ 11, 3 ¶ 18; Mot. 5-6 ¶¶ 30-32.)

On January 6, 2016, Plaintiff notified her automobile insurance provider, Defendant American National Property and Casualty Company ["ANPAC"], about the collision at issue, and formally requested that an underinsured motorist ["UIM"] claim be opened on her behalf. (Mot. 3-4 ¶¶ 17, 21, Ex. E, Ex. Z.) Defendant's adjuster, Tanya Zuffuto, immediately opened a UIM claim to investigate the incident. (Mot. 3 ¶ 18, Ex. Z.) The claims adjuster determined that the nonparty driver responsible for causing the accident maintained an automobile liability insurance policy with GEICO Insurance Company ["GEICO"] with a bodily injury policy limit of $100,000.00. (Mot. 5 ¶ 28, 7 ¶ 37, Ex. I, Ex. AC.)

Meanwhile, also on January 6, 2016, Plaintiff, at the urging of her chiropractor husband, sought treatment from Dr. Kenneth J. Allan, M.D at a pain management clinic. (Mot. 3 ¶¶ 13-14, 4 ¶¶ 22-24, Ex. C at 100:18-21, 126:23-25, Ex. D.) Upon initial examination, Dr. Allan attributed "100%" of Plaintiff's "pain and associated symptoms" to "injuries sustained in the trauma of the [motor vehicle collision]." (Mot. Ex. D at 4.) Dr. Allan recommended "instituting conservative rehabilitative modalities including physical therapy and chiropractic modalities." (*Id.* at 4-5.) Plaintiff was prescribed a muscle relaxant and a compounded topical pain cream. (*Id.* at 5.)

From January 2016 until May 2016, Plaintiff sought medical treatment from various healthcare providers on fifty-nine separate occasions. (Mot. 5 ¶ 30, Ex. C at 63:11-24, 64:2-9.) Throughout that time, Dr. Allan and Plaintiff's husband worked in tandem to coordinate Plaintiff's medical care, as well as to provide a large portion of her medical treatments, which primarily consisted of massage and chiropractic therapies. (Mot. 6 ¶ 31, Ex. C at 64:10-15.)

On January 21, 2016, Plaintiff presented to a neurologist at Blue Sky Neurology, on referral from Dr. Allan, with complaints of a "head injury."[4] (Resp. Ex. D at 1.) Plaintiff was evaluated "in consultation for post-concussive symptoms." (*Id.*) During that visit, Plaintiff reported her "cervical, hip, and lumbar pain" to be "greatly improved" due to "chiropractic manipulation and acupuncture." (*Id.*) Treatment notes from that visit state that Plaintiff had undergone a lumbar MRI, which "reportedly revealed mild swelling at L4-5 interspinous bursa and multilevel facet capsulitis in the lumbar spine, most pronounced at L3-4 and L4-5."[5] (*Id.*) Upon examination, the neurologist diagnosed Plaintiff with "post concussion syndrome," as well as "TBI [traumatic brain injury] (acceleration/deceleration) with amnesia 1/5/16." (*Id.* at 2.) However, in his report, the neurologist cautioned that "[t]he neurological examination today is non-focal; hence, a brain MRI is not clearly indicated at this time." (*Id.* at 3.) No finding of cognitive impairment was indicated. The neurologist concluded that Plaintiff's "primary issues"

---

[4] Blue Sky Neurology medical records state that Plaintiff was evaluated by both Dr. Allan and her husband one day after the car accident, on January 6, 2016. (Resp. Ex. D at 1.) Except as provided by Defendant, no medical records from Plaintiff's husband, or from Dr. Allan, were provided to this court to consider with respect to this Motion.

[5] The neurologist noted, however, that the formal MRI report and CD were unavailable for his review, and that he was, therefore, relying only upon written notes from Dr. Allan. (Resp. Ex. D at 1.) No MRI report or CD was ever provided to this court to consider with respect to this Motion.

were "related to pain, non-restorative sleep and mood disturbance." (*Id.*) Plaintiff was prescribed a muscle relaxant and an antidepressant. (*Id.*)

Plaintiff returned to Blue Sky Neurology for follow-up appointments, on April 5, 2016, and on May 9, 2016.[6] (*Id.* at 4-7.) At the April 5, 2016 appointment, Plaintiff's condition was found to be "slowly improving." (*Id.* at 4.) She was advised to continue taking her medication for an additional four to six weeks, and to "gradually increas[e] her daily exercise." (*Id.*) At the May 9, 2016 appointment, Plaintiff's symptoms were, likewise, found to be "slowly improving with therapy." (*Id.* at 6.) Treatment notes from that visit show that Plaintiff "continue[d] to suffer from significant issues related to mood," and that she was "provided samples of Nuedexta," which she was advised to take once a day. (*Id.* at 6-7.)

The record shows that Defendant continued to pay for Plaintiff's therapies, as she submitted bills, up to the $10,000.00 limit of her medical payment coverage. (Mot. 6 ¶ 35, Ex. J at RFA 5.) On May 23, 2016, almost five months after the accident, Ms. Zaffuto "ruled out" any exposure on Plaintiff's UIM claim, based on communications with GEICO, as well as the nature of Plaintiff's reported injuries. (Mot. 6 ¶¶ 33-34, Ex. H at 124:14-125:4.) Defendant's claims adjuster concluded that the at-fault driver's bodily injury insurance coverage with GEICO ($100,000.00) would be sufficient to fully compensate Plaintiff for her damages arising from the accident. (*Id.*)

Approximately six months later, on November 22, 2016, GEICO agreed to pay Plaintiff the at-fault driver's $100,000.00 policy limit to settle all claims against the at-fault driver. (Mot.

---

[6] No other medical records from Blue Sky Neurology were provided to the court, indicating an end of treatment by this provider, on May 9, 2016.

7 ¶ 37, Ex. I.)  Defendant thereafter provided consent for Plaintiff to settle with GEICO, on December 14, 2016, and she was subsequently paid $100,000.00 by GEICO.  (Mot. 7 ¶ 43, Ex. L.)

At around that same time, Plaintiff, through her attorney, began demanding that Defendant pay her $250,000.00 in UIM benefits.  (Mot. 7 ¶¶ 39-42, Ex. M, Ex. N, Ex. O.)  On December 6, 2016, Plaintiff's attorney sent a letter to Defendant, which approximated Plaintiff's economic and noneconomic damages from the January 5, 2016 car accident to range between $570,740.00 and $643,186.00.[7]  (Mot. 7 ¶¶ 39-40, Ex. O at 11.)  At that time, approximately one year after the accident, Plaintiff's accrued submitted medical treatment expenses amounted to roughly $48,000.00, and she had already received $110,000.00, collectively, from ANPAC and GEICO.  (Mot. 6 ¶¶ 35-36, Ex. J at RFA 5.)

Upon receipt of Plaintiff's demand letter, Defendant immediately began reevaluating her claim.  (Mot. 7 ¶ 42, 8 ¶¶ 44-45, Ex. M, Ex. P.)  In a December 22, 2016 evaluation note, Ms. Zuffuto questioned Plaintiff's damages calculation, writing that "attny [sic] included costs for surgery – disc replacement and fusion – does not appear to be recommended by any physician in current records."  (Mot. 8 ¶¶ 44-45, Ex. P at 4.)

Defendant's Claims Committee reviewed Plaintiff's UIM claim on December 29, 2016. (Mot. 8 ¶ 46, Ex. AE.)  At that review session, the Claims Committee addressed Plaintiff's "TBI [traumatic brain injury] and inner ear concussion" issues, but ultimately concluded that a "good

---

[7] The December 6, 2016 letter references medical records and billing statements from approximately twenty medical providers.  (*See* Mot. Ex. O at 1-3.)  None of these documents, aside from the aforementioned Blue Sky Neurology medical records, was provided to the court in connection with Defendant's motion for summary judgment.

recovery [was] anticipated." (*Id.*) Defendant's adjuster was thereby granted "floor authority to resolve" the claim. (*Id.*)

That same day, based on the Claims Committee's review, Defendant offered Plaintiff $30,000.00 in settlement of her UIM claim, in exchange for a release of all outstanding claims. (Mot. 8 ¶¶ 47-48, Ex. X, Ex. AE.) On January 31, 2017, Defendant sent Plaintiff a $30,000.00 check, as an advance payment, leaving open the option for further negotiations. (Mot. 8 ¶ 49, Ex. Q.)

Over the next four months, the parties continued to negotiate the amount of benefits owed in connection with Plaintiff's UIM claim.[8] (*See* Mot. 8 ¶ 50, Ex. R; Resp. Ex. B.) As of May 18, 2017, Plaintiff had refused Defendant's offer of an additional $10,000.00 in settlement, which brought the total ANPAC settlement offer to $40,000.00. (Mot. 8 ¶ 50, Ex. R; Resp. Ex. B.) Plaintiff, once again, demanded full payment of her policy limits, in the amount of $250,000.00. (*Id*.) Having failed to come to any agreement on settlement, and after another review by the ANPAC Claims Committee, on May 30, 2017, Defendant requested that Plaintiff undergo an independent medical examination ["IME"]. (Mot. 8 ¶ 50, Ex. R; Resp, Ex. C, 13:43:32-13:43:50.) Defendant advised Plaintiff's counsel that it "continued to dispute the cause and extent of [Plaintiff]'s claimed injuries and damages as a result of the accident, and in particular,

---

[8] The exhibits attached to the Response include a letter from Plaintiff's counsel, dated November 30, 2017, which indicates certain activities may have occurred during this time period. (*See* Resp. Ex. B.) Plaintiff, however, neither addresses the significance of these events, nor provides evidence for the court's consideration on summary judgment about these activities. This may have been the result of Plaintiff's conflation of the standard of review under Rule 12(b)(6), which requires a court to presume the factual allegations in a complaint to be true and to construe those allegations in the light most favorable to the plaintiff, with the standard for review under Rule 56, which requires the non-movant to come forward with admissible evidence demonstrating a genuine issue for trial on a material matter.

the reasonableness, necessity and relatedness of regenerative medicine treatment." (Mot. Ex. R at 1.)

On July 26, 2017, Plaintiff underwent an IME at Colorado Rehabilitation and Occupational Medicine in Aurora, Colorado. (Mot. 9 ¶ 51, Ex. S.) The IME was conducted by Dr. Tashof Bernton, M.D.[9] (*Id.*) After examining Plaintiff and reviewing her medical records, Dr. Bernton concluded, *inter alia*, that Plaintiff had been misdiagnosed with a cognitive impairment due to head injury. (Mot. Ex. S at 2.) Dr. Bernton also concluded that: (1) "performing a medial branch block at the same level that [Plaintiff] had a cervical facet injection was not clinically reasonable or medically necessary;" (2) that "further cervical injections at [initial] levels would not be clinically reasonable," given Plaintiff's lack of positive response to the initial injections; (3) that Plaintiff's stem cell injections "cannot be considered medically reasonable and necessary" for that same reason; (4) that Plaintiff's cognitive therapy was not clinically indicated due to a lack of objective neuropsychological testing; (5) that Plaintiff's medication trial with Nuedexta was not clinically indicated; and (6) that Plaintiff's psychologic treatment by Dr. Chinisci, aimed at "supporting the patient" as she "goes through her grieving process," was not "medically necessary." (*Id.* at 2-3.)

Dr. Bernton's IME report, dated August 11, 2017, was thereafter distributed to the parties. (Mot. 10 ¶ 59, Ex. V; *see* Compl ¶ 41.) After its receipt of the IME report, the ANPAC Claims Committee met, once again, with respect to Ms. Anderson's claim. (Resp. Ex. C at 13:43-13:44.) By letter, dated September 12, 2017, Defendant's claims adjuster notified Plaintiff

---

[9] Dr. Bernton is board certified in Internal Medicine and Occupational Medicine and has thirty-nine years of clinical experience in rehabilitation and occupational medicine. (Mot. 9 ¶ 52, Ex. T at 94:21-95:24.)

that, upon its review of the IME report, Defendant "continue[d] to dispute the reasonableness, necessity and relatedness of the regenerative medicine treatment" received by Plaintiff. (Mot. 10 ¶ 59, Ex. V.) Ms. Zaffuto emphasized that Dr. Bernton found certain of Plaintiff's medical treatment to have not been "clinically reasonable or medically necessary." (*Id.*) The letter concluded by stating that ANPAC would "maintain its current offer of $40,000.00 as a full and final settlement of the claim for [UIM] benefits," despite Dr. Bernton's conclusions that a large portion of Plaintiff's medical expenses should be disallowed. (*Id.*)

On November 30, 2017, Plaintiff's counsel sent a letter to Defendant challenging the medical conclusions set out in the IME report. (Resp. Ex. B.) As support, Plaintiff's counsel attached two letters from Dr. Allan, both of which were dated October 13, 2017. (*Id.* at 15-36.) In both of those letters, Dr. Allan criticized Dr. Bernton's findings, and set forth his own opinion that Plaintiff would, in fact, require significant future medical treatment.[10] (*Id.* at 16, 29.)

That same day, November 30, 2017, Plaintiff filed this lawsuit in Colorado state court, to recover UIM policy benefits.[11] (Doc. No. 1-1.) Defendant thereafter removed the case to federal court, on December 14, 2017, on the basis of diversity jurisdiction. (Doc. No. 1 at 2 ¶ 3.) In her Complaint, Plaintiff asserts three causes of action: (1) breach of contract; (2) common law bad faith breach of insurance contract; and (3) statutory unreasonable delay and denial of benefits.

---

[10] It is unclear why Dr. Allan wrote two distinct, but overlapping, letters. Although Dr. Allan's letters were each dated October 13, 2017, his critiques were not provided to Defendant until November 30, 2017, when they were attached to the letter from Plaintiff's counsel. (Resp. 7.) Up to that time, Plaintiff had offered no criticism or disagreement with the IME, or with Dr. Bernton's qualifications to render such an assessment.

[11] A copy of the file stamped complaint was attached to the November 30, 2017 letter to Defendant, the same letter which contained the first notification of Dr. Allan's dissent to the IME. (Resp. Ex. B at 7-14.)

(Compl. ¶¶ 53 – 69.)  Defendant now moves for summary judgment on all three of Plaintiff's

claims.

## STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial

burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex*, 477

U.S. at 325.  "Once the moving party meets this burden, the burden shifts to the nonmoving party

to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City &

County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The

nonmoving party may not rest solely on the allegations in the pleadings, but instead, must

designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at

324; *see also* Fed. R. Civ. P. 56(c).

"A 'judge's function' at summary judgment is not 'to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v.

Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249

(1986)).  Whether there is a genuine dispute as to a material fact depends upon "whether the

evidence presents a sufficient disagreement to require submission to a jury," or conversely,

whether the evidence "is so one-sided that one party must prevail as a matter of law.  *Carey v.

U.S. Postal Service*, 812 F.2d 621, 623 (quoting *Anderson*, 477 U.S. at 251-52).  A disputed fact

is "material" if "under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson*, 477 U.S. at

248).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In evaluating a motion for summary judgment, a court may consider admissible evidence only.  *See Johnson v. Weld Cnty.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Concrete Works*, 36 F.3d at 1517.  However, this standard does not require the court to make unreasonable inferences in favor of the non-moving party.  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008).  The nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case.  *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994).

## ANALYSIS

### A.    *Common Law and Statutory Bad Faith Claims*

Plaintiff asserts two bad faith claims: (1) bad faith breach of an insurance contract, which is a common law tort under Colorado law; and (2) unreasonable delay or denial of insurance benefits, which is a statutory penalty under §§ 10-3-1115 and 10-3-1116 of the Colorado Revised Statutes.  (Compl. 6-7 ¶¶ 49-58.)  Plaintiff alleges, specifically, that Defendant acted unreasonably by delaying the investigation of her UIM claim, by "improperly evaluating" the claim, and ultimately, by denying the payment of benefits.  (*Id.* at 7 ¶¶ 62, 67.)  Defendant

moves for summary judgment on both claims, contending that Plaintiff has failed to put forth any evidence to show that it acted unreasonably at any stage of the claims process. (Mot. 15-18.)

In Colorado, to prevail on a claim for common law bad faith, a plaintiff must prove that the insurer "acted unreasonably and with knowledge of or reckless disregard for the fact that no reasonable basis existed for denying the claim." *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 847 (Colo. 2018) (quoting *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1274 (Colo. 1985)). To prevail on a statutory bad faith claim, by contrast, a plaintiff need only prove that a benefit to which she was entitled under an insurance policy was unreasonably delayed or denied. *Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 756 (Colo. App. 2012); *see* C.R.S. § 10-3-1115(1)(a) ("[A] person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant."). If the statutory requirement is met, a plaintiff is entitled to receive a penalty payment of two times the benefit (in addition to the benefit itself), plus reasonable attorney's fees and costs. C.R.S. § 10-3-1116(1); *see Vaccaro*, 275 P.3d at 756 (noting that, because of the lesser liability burden and the onerous penalty provision, a statutory bad faith claim is "arguably . . . more financially threatening to the insurer than a traditional common law bad faith claim").

Importantly, under both the statute and the common law, Plaintiff must prove that Defendant acted unreasonably. "What constitutes reasonableness under the circumstances is ordinarily a question of fact for the jury." *Vaccaro*, 275 P.3d at 759. But, "in appropriate circumstances, as when there are no genuine issues of material fact, reasonableness may be decided as a matter of law." *Id.* The burden to establish unreasonableness lies with Plaintiff. *See Williams v. Owners Ins. Co.*, 621 F. App'x 914, 919 (10th Cir. 2015).

"The reasonableness of the insurer's conduct must be determined objectively, based on proof of industry standards." *Schultz*, 429 P.3d at 847 (quoting *Goodson v. Am. Standard Ins. Co. of Wisc.*, 89 P.3d 409, 415 (Colo. 2004) (common law bad faith); *Fisher v. State Farm Mut. Auto. Ins. Co.*, 419 P.3d 985, 994 (Colo. App. 2015) (statutory bad faith claim). Industry standards may be established through expert opinion or state law. *Goodson*, 89 P.3d at 415; *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343 (Colo. 2004). Further, "[a]n insurer's decision to deny benefits to its insured must be evaluated based on the information before the insurer at the time of that decision." *Schultz*, 429 P.3d at 847 (quoting *Peiffer v. State Farm Mut. Auto. Ins. Co.*, 940 P.2d 967, 970 (Colo. App. 1996)); *see Bankr. Estate of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 523 (Colo. App. 2008) ("[T]he question is whether a reasonable insurer under the circumstances would have denied or delayed payment of the claim.")

Defendant argues, in its Motion, that it had a "reasonable basis" for each of its decisions as to Plaintiff's UIM claim. In support of that contention, Defendant has produced evidence to show that it investigated Plaintiff's claim in a prompt and thorough manner and that it maintained active communication with Plaintiff and her attorney throughout the review process. Specifically, the record presented to the court on summary judgment shows that ANPAC provided Plaintiff with written explanations of its coverage decisions on May 30, 2017, and again, on September 12, 2017. (Mot. Ex. R, Ex. V.) In addition, Defendant timely provided Plaintiff with a copy of the full IME report, as well as a detailed explanation regarding its settlement position subsequent to the IME. (Mot. Ex. V.) Further, the evidence in the record shows that, up until November 29, 2017, there was no denial of Plaintiff's UIM coverage. Rather, Defendant continued to offer Plaintiff $40,000.00 to settle her UIM claim, over and

above the payment she had already received from GEICO and the medical expenses coverage already provided by ANPAC. And, even after Dr. Bernton concluded that much of Plaintiff's treatment prior to the IME was not justified, Defendant did not lower its settlement offer to Plaintiff with respect to her UIM claim. (*See id.*)

Plaintiff, for her part, has failed to point to sufficient evidence to raise a genuine issue of material fact on whether Defendant's actions were unreasonable. Instead of challenging Defendant's factual presentation, Plaintiff argues, primarily, that the insurer "selectively pars[ed]" the evidence "to focus only on those aspects of its adjustment of the claim that it believes were reasonable." (Resp. 6 ¶ 9.) However, even if Defendant simply "cherry-picked" evidence to support its defense, Plaintiff's burden in response to a motion for summary judgment is to supply the court with the relevant missing evidence that Defendant did not reference, and which Plaintiff claims support her causes of action. *See* Fed. R. Civ. P. 56(c)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record[.]"); *Cross v. The Home Depot,* 390 F.3d 1283, 1290 (10th Cir. 2004) ("[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record.").

The exhibits attached to Plaintiff's Response include the Complaint (which is not evidence); a letter from Plaintiff's counsel; letters from Dr. Allan regarding his criticisms of the IME report (none of which were provided to Defendant prior to the filing of this lawsuit with the accusation of bad faith); partial deposition testimony from Defendant's employee, Richard Elet, concerning his ability to assess the medical qualifications of the IME physician; and Plaintiff's

medical records from Blue Sky Neurology. (*See* Resp. Ex. A-D.) The exhibits attached to

Plaintiff's Supplemental Response include more letters from her attorney, which reference

additional medical records, none of which have been provided to the court;[12] a letter from

Plaintiff's husband; partial deposition testimony from Tanya Zaffuto and Richard Elet (once

again, concerning his ability to assess Dr. Bernton's medical competence); letters from ANPAC

regarding Plaintiff's request for the insurer's settlement position; copies of Defendant's initial

disclosures and supplements; and a July 13, 2018 report from Plaintiff's retained expert. (*See*

Supp. Resp. Ex. 1-8.)

Aside from issues regarding admissibility and sufficiency, Plaintiff, for the most part,

fails to cite to specific portions of any of this evidence to support her arguments. *See Mitchell v.

City of Moore, Okla.,* 218 F.3d 1190, 1199 (10th Cir. 2000) (explaining that the court is "not

obligated to comb the record in order to make [plaintiff's] arguments for [her]"). Nevertheless,

the court will evaluate the merits of Plaintiff's arguments, as best it can.

### 1. *Reasonableness of the Explanation for Settlement Offers*

Plaintiff argues, first, that Defendant acted unreasonably with respect to her UIM claim,

because it engaged in certain practices that are prohibited by the Colorado Unfair Claims

Settlement Practices Act. (Resp. 8-10 ¶¶ 13-14.) Plaintiff contends, specifically, that Defendant

failed to provide her with an adequate explanation as to how it had evaluated her UIM claim.

(*Id.* at 8-9 ¶ 13.) According to Plaintiff, "Colorado law is quite clear that the insurer is obligated

to provide a prompt, reasonable explanation of its evaluation of [a] claim to the insured that is

---

[12] By failing to produce the additional medical records, or to even argue that they support her
claims, the court infers that the additional medical records provide no evidentiary support for
Plaintiff's opposition to the instant Motion.

based on the facts of the case and applicable law." (*Id.* at 9 ¶ 13.) Plaintiff contends that, despite

her "repeated requests," Defendant "refuses to provide an explanation of its position other than

broad generalization." (*Id.* at 9 ¶ 14.) She contends further that there is "simply no evidence"

that Defendant "ever considered or valued" her claim for "lost wages, future medical expenses,

temporary or permanent disability[,] or non-economic damages for pain and suffering/loss of

enjoyment of life." (Supp. Resp. 5 ¶ 6.)

The Colorado Unfair Claims Settlement Practices Act requires a "reasonable explanation

of the basis in the insurance policy… for the offer of a compromise settlement." C.R.S. § 10-3-

1104(1)(h)(XIV). In evaluating a personal injury claim, three elements of damages are

considered: (1) economic damages, (2) non-economic damages, and (3) physical impairment or

disfigurement. *See* Colo. Jury Instr., Civil 6:1.

In this case, Plaintiff's own proffered evidence shows that she knew, at least as of April

18, 2017, that Defendant was placing no value on any claim for future medical care. (*See* Resp.

Ex. B at 2.) Further, Plaintiff learned, via the IME report, that Defendant did not place any value

on permanent physical impairment. (*See* Mot. Ex. S at 4.) Prior to the filing of this lawsuit,

Plaintiff's medical expenses, even by conservative estimates, were significantly below

$100,000.00, which was the amount of compensation that she had already received from

GEICO.[13] Plaintiff therefore knew, or should have known, that any money offered by Defendant

was intended as payment for non-economic damages, including "physical and mental pain and

---

[13] Even months later, Plaintiff, as part of her Rule 26 initial disclosures made January 31, 2018, produced a medical bill summary claiming $82,355.78 in medical expenses. (Mot. 10 ¶ 62, Ex. F.)

suffering, inconvenience, emotional stress, and/or impairment of the quality of life."  *See* Colo.
Jury Instr., Civil 6:1.

Although she fails to adequately cite to this evidence as part of the summary judgment
record, Plaintiff has produced a July 13, 2018 report from her retained expert, Michael J.
Rosenberg.  (Supp. Resp. Ex. 8 ["Rosenberg Report"]; *see* Supp. Reply Ex. 1 ["Rosenberg
Deposition"].)  Again, although Plaintiff never directly references Mr. Rosenberg's report in her
response briefs, the court infers that the report was offered as evidence of the industry standards
applicable to this case.

In his report, Mr. Rosenberg sets out twenty-eight enumerated opinions, [14] supposedly
offered to prove that Defendant failed to meet pertinent industry standards.  (Rosenberg Rep. 14-
15.)  Several of those opinions are directed at Defendant's allegedly unsatisfactory explanations
regarding its settlement position.  (*Id.*)  Mr. Rosenberg states, among other things, that
Defendant: "(10) fail[ed] to respond to communications from [Plaintiff]'s counsel requesting a
breakdown of ANPAC's evaluation;" "(16) fail[ed] to explain or document the basis for its
$30,000 undisputed medical expense payment;" "(17) fail[ed] to explain why it was not paying
undisputed general damages;" "(26) fail[ed] to provide a breakdown by categories for the
amount of its low-ball[15] settlement offer (e.g., pain and suffering and permanent impairment/

---

[14] Mr. Rosenberg subsequently retracted several of his opinions, including numbers 6, 15, 19, 22,
23, 26, in part, and 27, in part.  (Rosenberg Dep. 116:1-24, 205:23-207:16, 261:13-24, 264:17-25,
269:12-271:1, 276:13-277:8.)  Therefore, the court does not consider those opinions.

[15] Mr. Rosenberg later conceded that the term "low-ball" to describe the company's settlement
offer should be deleted.  (Rosenberg Dep. 269:12-15.)

disfigurement are separately compensable under Colorado law);" and (28a)[16] "failing to timely respond to communications from [Plaintiff]'s counsel respecting the claim."[17]  (*Id.* at 15.)

These conclusory opinions, which are not undergirded with citation to record evidence, fail to provide evidence of a violation of industry standards by Defendant.  Opinions 10 and 28a find no support in the record.  Specifically, the record shows that Defendant responded to all of Plaintiff's requests.  That Plaintiff did not concur with ANPAC's response does not mean a response was not tendered.  Opinions 16 and 17 misconstrue what is clearly an offer of settlement from Defendant.  Likewise, Opinion 26 finds no support in the evidentiary record.[18] (*See* Mot. Ex. P at 4.)  Mr. Rosenberg also provided no evidentiary basis for his opinion regarding wage or income loss, stating instead:

> [F]rom what I could see, you know, that she obviously had missed work.  There was time off but for this accident she would not have missed.  And, yet, I didn't see any attempt [] on ANPAC's part to appreciate that, acknowledge that, and offer something for that even if she was not able to document, you know, I missed X day and I make $8 an hour and I work 40 hours a week, you know, that sort of thing. . . . I would have liked to have seen [ANPAC] at least acknowledging that.

---

[16] There are two enumerated opinions identified as number 28.  (*See* Rosenberg Rep. 15.)  This is the first number 28, so it will be referenced as number 28a.

[17] Mr. Rosenberg testified that two instances support this opinion: (1) Defendant did not respond to Plaintiff's request for a breakdown of its settlement figure; and (2) Defendant did not respond to Dr. Allan's critique of the IME report.  However, since Defendant was never given an opportunity to respond to Dr. Allan's critique of the IME report, Mr. Rosenberg's opinions based on this alleged failure (opinions 11, 13, 21, 24 and 28a), will be disregarded, as they cannot support an opinion that Defendant's conduct was unreasonable.

[18] Appended to Plaintiff's Supplemental Response is a letter from her husband to ANPAC, dated July 10, 2017, which details Plaintiff's difficulties in working at the family business.  (Supp. Resp. Ex. 1 at 13-18.)  Plaintiff, however, does not mention the letter in any of her pleadings, nor does she present any argument at all about its relevance.  *See Cross,* 390 F.3d at 1290 (rejecting the argument that the district court should have considered evidence in the summary judgment record, which was not cited by the plaintiff, because "it is the responding party's burden to ensure that the factual dispute is portrayed with particularity").

(Rosenberg Dep. 268:19-269:11.)  In addition, Mr. Rosenberg conceded that, even if ANPAC had provided Plaintiff with a more detailed explanation of its settlement offer, it would "make [no] difference in where we are sitting here today.  Most likely it would not."  (*Id.* at 227:6-7.)

Plaintiff has not cited, nor has the court found, any legal authority for the proposition that an insurer's settlement offer must include a detailed break down and analysis of every category of damages considered or rejected, including undefined and unspecified wage loss, or loss to an insured's family business occasioned by the insured's absence, without submittal of any economic evidence in support.  And, while Mr. Rosenberg does opine in conclusory fashion that Defendant breached industry standards by failing to adequately investigate and evaluate her wage loss claim, he does not assert that the insurer was unreasonable simply by virtue of its failure to include a specified valuation for the wage loss claim in its explanation and offer of settlement.  Indeed, Mr. Rosenberg admitted that no single enumerated opinion alone, including opinion 26, established bad faith on the part of the insurer.  (*Id.* at 195:21-196:11, 223:5-9.)

The undisputed record shows that, as soon as Plaintiff requested a claim valuation from Defendant, she received a response.  In assessing whether Defendant gave a "reasonable explanation" for its settlement offer, it is irrelevant that the insurer continued to value the UIM claim at far below the $250,000.00 policy limit.  *See Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 759 (Colo. App. 2012) ("An insurer is under no obligation to negotiate a settlement when there is a genuine dispute as to the amount of compensable damages payable under the terms of an insurance policy."); *Sanderson v. American Fam. Mut. Ins. Co.,* 251 P.3d 1213, 1218 (Colo. App. 2010) ("[F]air debatability is not a threshold inquiry that is outcome determinative as a matter of law, nor is it both the beginning and the end of the analysis in a bad faith case.").

On this record, then, there is no evidentiary support from which a reasonable juror could conclude that Defendant failed to sufficiently explain its reasoning for extending a $40,000.00 offer of settlement to Plaintiff on the UIM claim, in violation of industry and legal standards.

### 2.     *Reasonableness of the Claims Investigation*

Plaintiff also contends that Defendant's actions were unreasonable with respect to its investigation of her UIM claim. Plaintiff argues, specifically, that Defendant failed to investigate "specifically-identified errors and omissions" in the IME report, as part of its evaluation of her claim. (Resp. 6-7 ¶ 10.) Plaintiff is adamant that the IME report was fundamentally flawed, because it "contained numerous errors, omissions[,] and unsupported findings contrary to established medical diagnoses." (*Id*.) In addition, Plaintiff complains that Defendant "lacked the ability to assess whether [Dr. Bernton] was qualified to express the opinions in the [IME] report." (*Id.* at 7 ¶ 11.)

The record shows that, as soon as Plaintiff reported her UIM claim, Defendant's claims adjuster, Tanya Zaffuto, contacted Plaintiff, her attorney, and GEICO. (Mot. Ex. Z-AE.) And, even though Defendant eventually closed the "exposure" on the claim in the Spring of 2016, the insurer continued to collect medical billings and monitor the case. The 2016 closure of the UIM claim rendered no harm whatsoever to Plaintiff, since the claim was reopened immediately after Plaintiff settled with the at-fault driver for policy limits, as well as upon her demand for policy limit payment on her UIM coverage.

ANPAC claim notes provide: "at first glance does appear claim exceeds both –not sure substitution of limits is proper being that there is mention of disc replacement surgery." (Mot. Ex. M.) On December 22, 2016, Ms. Zaffuto created a detailed evaluation, and questioned

Plaintiff's damages argument, noting "attny included cost for surgery – disc replacement and fusion – does not appear to be recommended by any physician in current records." (Mot. Ex. M at 4, Ex. P.) Ms. Zaffuto and ANPAC's Claims Committee reviewed the claim and concluded: "Good recovery anticipated. Floor authority to resolve. Bring back as needed." (Mot. Ex. AE). Ms. Zaffuto's manager also wrote: "reviewed eval[uation] with cr [claim representative] and committee. auth[ority] best terms to $50k." (*Id*.)

The reopened UIM claim then proceeded. Between January 2017 and May 2017, Plaintiff's medical records continued to be collected and reviewed by ANPAC, and conversations were active and ongoing between the parties. Upon submission of the IME report, in September 2017, a settlement offer was, again, tendered by ANPAC, along with a letter fully explain how and why it evaluated the claim the way that it did.

Plaintiff has failed to put forth any admissible evidence to show that Defendant's investigation of her UIM claim violated industry standards. In fact, the court cannot find any evidence of delay in the investigation or consideration of her claim. Mr. Rosenberg's report should, but unfortunately does not, ameliorate the problem. Mr. Rosenberg offers several opinions about actions which might have been taken, which in his opinion, would have been "preferable" or "ideal," but none of which are industry standards or norms with respect to the investigation of a claim. (*See* Rosenberg Rep. 14-15, enumerated opinions 2, 3, 5, 7, 12, 14, 18, 20, and 25.) Several of Mr. Rosenberg's opinions simply disparage Dr. Bernton, without any basis or justification. (*Id*. at enumerated opinions 7 (referring to Dr. Bernton as "defense-minded"), 12 (referring to Dr. Bernton as "a biased IME examiner") and 18 (referring to Dr. Bernton as "its biased examiner"). Even Mr. Rosenberg's prefatory remarks, regarding when

and why defense counsel was retained by ANPAC, do not speak to any industry standard or harm to Plaintiff. (Rosenberg Rep. 4-6.) Rather, the remarks appear to serve as springboards to air his negative suspicions about ANPAC's state of mind.

Several of Mr. Rosenberg's remaining enumerated opinions are irrelevant, given that the expert himself admitted that Plaintiff was unaffected and unharmed by any of ANPAC's alleged failures. (*See* Rosenberg Rep. 14-16 at enumerate opinions 1, 4, 8, 9, and 16 and 17). And, importantly, several of his opinions must be discarded, because he assumed, incorrectly, that ANPAC had been in possession of Dr. Allan's criticisms of the IME report before the lawsuit was filed. In fact, Plaintiff failed to inform Mr. Rosenberg that she had given ANPAC no opportunity, at all, to investigate Dr. Allan's accusations with respect to the IME. (*See* Rosenberg Rep. 15 at enumerated opinions 11 (assuming inadequacies of IME were brought to the attention of ANPAC by Plaintiff's counsel), and 13 (assuming ANPAC failed to request an addendum to the IME.)

In an apparent attempt to rectify this rather glaring "cart-before-the-horse" litigation strategy, Plaintiff now claims, without reference to industry standards, that Defendant's adjusters and employees lacked the ability to determine whether Dr. Bernton was qualified to express his opinions in the IME report, and that this constitutes bad faith. (*See* Resp. 7-8 ¶ 11.) As an initial matter, this argument is completely irrelevant, given that no challenge has been made to Dr. Bernton's qualifications to render expert medical testimony in this case. Dr. Bernton is a licensed medical doctor with thirty-nine years of clinical experience. No motion to exclude his opinions, pursuant to Federal Rule of Evidence 702 or 703, is pending, and the deadline to file such a motion has lapsed. Second, Plaintiff has failed to identify any industry or legal standard

requiring special qualifications by insurance adjusters to review an IME report prepared and submitted by a licensed medical doctor, nor has Plaintiff presented any evidence that an insurance company must institute special policies or procedures to review such a report.[19] Plaintiff's bad faith expert did not render an opinion that industry standards were violated by Defendant with regard to its employees' qualifications to review the IME doctor or that doctor's report, nor did he render an opinion that industry standards required special policies or procedures to review such a report. Regardless of who selected Dr. Bernton to perform the IME, the issue here is the reasonableness of Defendant's reliance on the IME, based on the totality of evidence before the insurer at that time.

As a final matter, the Complaint might be read to assert that Defendant failed to fully investigate, by not giving equal consideration to the positions of Plaintiff's medical providers as it did to the positions of Dr. Bernton. (*See* Supp. Resp. 10, ¶ 13.) Colorado law imposes a duty on an insurer to fairly consider an insured's interests and potential personal liability, in addition to its own interests. *Lira v. Shelter Ins. Co.*, 903 P.2d 1147, 1150 (Colo. App. 1994), *aff'd,* 913 P.2d 514 (Colo. 1996). It is well-settled, however, that the equal consideration doctrine does not apply to first-party insurance claims, such as the one at bar. *See Bailey v. Allstate Ins. Co.*, 844 P.2d 1336, 1339 (Colo. App. 1992) ("The insurer has a right to protect its own interests along with those of the insured, and these interests run parallel to each other, neither being superior.").

In this case, there is no question that the parties disagree over the value of Plaintiff's UIM claim. Indeed, medical professionals continue to disagree about the nature and extent of

---

[19] Ultimately, Dr. Allan's criticisms were addressed in the form of a rebuttal expert report. (*See* Supp. Reply Ex. AL.)

Plaintiff's injuries, as well as whether certain treatments and procedures are medically warranted. But reasonable value disputes are not evidence of bad faith or unreasonable conduct. *See Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1226 (10th Cir. 2016) (quoting *Vaccaro*, 275 P.3d at 759-60) ("If a reasonable person would find that the insurer's justification for denying or delaying payment of a claim was 'fairly debatable,' this weighs against a finding that the insurer acted unreasonably."); *see also Rivera v. State Farm Mut. Auto. Ins. Co.*, No. 16-cv-00227-MSK-MJW, 2017 WL 4012134, at *4 (D. Colo. Sept. 12, 2017) (explaining that, in such circumstances, the court "must review the remaining evidence put forward before it to determine whether a reasonable jury might conclude that [the insurer's] conduct has been unreasonable even despite the existence of a 'fairly debatable' . . . justification for its refusal to pay the claim").

Here, the record shows that Defendant carried forward with its investigation of Plaintiff's claim, communicated with Plaintiff's attorney and the insurance company representing the at-fault driver, gathered all medical records, and sought and conducted an IME. After the IME physician rejected the necessity of a large percentage of Plaintiff's treatments, Defendant continued negotiations with Plaintiff, neither lowering its settlement offer, nor denying coverage under its UIM provisions. The undisputed record shows that, at the time of Defendant's decision to renew its $40,000.00 settlement offer as to Plaintiff's UIM claim, Defendant was completely unaware of Dr. Allan's criticisms of the IME report, and it was given no opportunity to review Dr. Allan's letters prior to being accused of bad faith in its investigation.

There is no admissible evidence brought forth as part of the summary judgment record, upon which a reasonable juror could rely, to find that ANPAC lacked a reasonable basis in

support of its valuation of the claim.  In Colorado, acting "without a reasonable basis" has been construed to mean pursuing a groundless position that is not supported by any credible evidence. *See Bd. of Cnty. Comm'rs v. Auslaender,* 745 P.2d 999, 1001 (Colo. 1987) (interpreting "without a reasonable basis" in a statute regarding the award of attorney fees in litigation against a public entity).  In the absence of evidence to show that ANPAC's position lacked a reasonable basis, Plaintiff's common law and statutory bad faith claims fail, as a matter of law.  Therefore, Defendant is entitled to summary judgment as to those claims.

### B.    *Breach of Contract*

Plaintiff alleges that Defendant breached the terms of her insurance policy by failing to pay the full value of her claim for UIM benefits.  (Compl. 6 ¶¶ 53-58.)  Defendant moves for summary judgment on this claim, as well, contending that Plaintiff cannot show a breach of contract attributable to Defendant's failure to pay more than $40,000.00 on the UIM claim. (Mot. 13-15.)

The insurance policy at issue [the "Policy"] sets out explicit requirements with which an insured must comply with to secure UIM coverage. (*See* Mot. Ex. Y ["Insurance Policy"] at 10-11. [20])  Under the section entitled, "Coverage J – Uninsured Motorist and Underinsured Motorist Coverage," ANPAC agrees to "pay damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle." (*Id.* at 10.)  The Policy defines "bodily injury" as "bodily injury to a human being, and sickness,

---

[20] For ease of reference, the court will cite to the page number of the Policy itself, which is imprinted on the bottom center of each page, rather than cite to the court-stamped page number, which appears on the upper right corner of each page.  The provisions of the Policy begin at court-stamped page number 15, with a cover page entitled "Colorado Automobile Policy."

disease, or death that results from it." (*Id*. at 2.) An "underinsured motor vehicle" is defined by the Policy as "a land motor vehicle, the ownership, maintenance, or use of which is insured or bonded for bodily injury or death at the time of the accident, but the bodily injury liability limits are less than the total damages for bodily injury or death that the insured person is legally entitled to collect." (*Id*. at 11.)

Under Colorado law, the required elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) damages suffered by the plaintiff as a result of the defendant's breach. *W. Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. 1992). Here, the parties do not dispute the existence of a contract or Plaintiff's performance, and therefore, elements one and two are satisfied for these purposes. The only issue to be considered with respect to summary judgment on the breach of contract claim is whether Plaintiff can prove that Defendant failed to perform under the insurance policy.

As an initial matter, breach of contract is not a tort, even though all contracts carry an implied duty of good faith and fair dealing, which can give rise to tort claims for bad faith, and to damages for breach of contract. *Goodson v. Am. Standard Ins. Co. of Wisc.*, 89 P.3d 409, 414 (Colo. 2004) (explaining that insurance contracts are unique, in that "an insurer's breach of the duty of good faith and fair dealing gives rise to a separate cause of action arising in tort"); *see Baumann v. Am. Family Mut. Ins. Co.*, No. 11-CV-00789-CMA-BNB, 2012 WL 122850, at *3 (D. Colo. Jan. 17, 2012).

In this case, as in most insurance cases, there are two distinct claims arising from a single claim for breach of contract. One claim is brought to determine legitimate contract damages, if

one of the parties did not receive the benefit of the contract, and another claim is based on tort liability for the breach of the duty of good faith and fair dealing. Although Plaintiff references the duty of good faith and fair dealing, in her Complaint, she alleges only that "ANPAC has breached the Policy by failing to pay underinsured motorist benefits to Plaintiff as a result of the injuries, damages and losses sustained in the aforementioned collision," and that "[a]s direct and proximate result of the Insurer's breach of the Policy, Plaintiff has suffered injuries, damages, and losses." (Compl. 6 ¶¶ 56, 58.)

The tort liability inherent in a breach of an insurance contract claim is subject to the same analysis as a tort claim for bad faith. *See Williams v. Auto-Owners Ins. Co.*, Case No. 12-cv-00999-MSK-CBS (D. Colo. March 25, 2014) (explaining that "all three claims [contract breach of good faith and fair dealing, common law bad faith, and statutory bad faith]. . . share a common element" that require a plaintiff to establish that the insurer's failure to pay under an insured's policy "immediately and in full, was unreasonable and bad faith conduct"). Therefore, to the extent that Plaintiff is alleging breach of contract for breach of the implied contractual duty of good faith and fair dealing, summary judgment in favor of Defendants is granted, for the same reasons set forth in Section A herein.

The second type of breach of contract claim arises in a purely contractual context, *e.g.,* the failure of performance of contractual obligations by one of the parties to a contract. In this case, if it is determined that Plaintiff was denied benefits owed under her UIM coverage, then Defendant has breached the contract, regardless of the insurer's good or bad faith. *See Baumann v. Am. Family Mut. Ins. Co.*, No. 11-CV-00789-CMA-BNB, 2012 WL 122850, at *4 n.6 (D.

Colo. Jan. 17, 2012) ("To the extent that Defendant has failed to pay any benefits to Plaintiff that are determined owed, Defendant has breached its contract.").

To resolve the motion for summary judgment with respect to the second type of breach of contract claim, the court must look to the Policy at issue. In Colorado, the interpretation of an insurance contract is a question of law, to which traditional principles of contract interpretation apply. *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1059 (Colo. 2005). Here, the pertinent language of the Policy provides that "determination whether an insured person is legally entitled to recover damages or the amount of damages shall be made by agreement between the insured person and us." (Insurance Policy 10.)

Defendant argues that the Policy does not obligate it to make payment, until the parties agree on the amount of benefits owed. (*Id.* at 14.) Unfortunately, this commonplace requirement with respect to actual payment of a claim has occasionally led to the illogical argument that a plaintiff's claim should not proceed to trial, only because "she has not yet proven at trial what she will attempt to prove at trial," *i.e.,* what the insurer *should* have paid under the policy, versus what the insurer actually paid. *Baumann,* 2012 WL 122850, at *4.

Defendant insists that it is not making such an argument, but it still asserts that, since the parties have not yet agreed on a damages amount, neither party can invoke the court's jurisdiction via a breach of contract claim to resolve the issue through judicial determination. (Reply 5.) Defendant argues that the breach of contract claim, itself, should be dismissed "for the independently sufficient reason that Plaintiff never presented admissible evidence to support her claims." (*Id.*) While the court agrees with Defendant with respect to the bad faith part of the contract claim, to carry the argument forward to the contractual part of the claim would

improperly penalize Plaintiff, because she "has not yet proven at trial what she will attempt to prove at trial." *Baumann*, 2012 WL 122850, at *4.

"The root purpose of a contract remedy is 'to place the plaintiff-promisee in as good a position as [she] would have occupied had the defendant-promisor not breached the contract.'" *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1026 (10th Cir. 2018) (quoting *In re Carvalho*, 335 F.3d 45, 51 (1st Cir. 2003)). Such damages are known as "expectation damages," and in an action for breach of contract, "expectation damages are the norm." *Spring Creek*, 887 F.3d at 1026 (citing *Smith v. Farmers Ins. Exch.*, 9 P.3d 335, 337 (Colo. 2000)).

Here, Plaintiff's breach of contract claim seeks to determine the amount of "damages for bodily injury which an insured person [Plaintiff] is legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle." (*See* Insurance Policy 10.) Plaintiff has apparently produced medical billings involving dozens of treatments by at least nineteen providers. In the IME, in fact, Dr. Bernton addressed many of the Plaintiff's treatments, finding a large portion to have been unnecessary. Obviously, Plaintiff's treatment, her need for certain kinds of treatment, the number of providers who are providing her with treatment, her prognosis from the treatment, and the past and future costs for her necessary treatment, are all material matters which are in dispute. There is also a dispute in this case as to whether the UIM coverage was or should have even been triggered, given the $100,000.00 threshold.

To the extent that Plaintiff can prove that her damages incurred as a result of the January 5, 2016 accident exceed $140,000.00 (the amount paid by GEICO plus the

amount offered by ANPAC), a jury could find that Defendant breached the insurance contract by failing to fully "pay damages for bodily injury which an insured person is legally entitled to recover from" the at-fault driver. (Insurance Policy 10.) On the record here, summary judgment for Defendant on the breach of contract claim, outside of the tort context, is not appropriate, because Plaintiff has presented evidence showing a genuine dispute of material fact regarding the total amount of damages attributable to the January 5, 2016 accident, and whether the Defendant has fully performed under the insurance contract.

It is therefore **ORDERED**

Defendant's "Motion for Summary Judgment by Defendant" [Doc. No. 103] is **GRANTED, in part, and DENIED, in part**. Specifically, the Motion is GRANTED as to Claim 2 (statutory bad faith) and Claim 3 (common law bad faith). At the time judgment enters in the case, judgment with prejudice shall enter on behalf of Defendant, and against Plaintiff, as to Claim 2 and Claim 3. As to Claim 1, the Motion is GRANTED with respect to the claim of breach of the implied covenant of good faith and fair dealing in the insurance contract. The remainder of the breach of contract claim will proceed.

Dated January 23, 2020.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge